UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                        :
GIOCONDA LAW GROUP PLLC,                                 :
                                    Plaintiff,           :
                                                        :          12 Civ. 4919 (JPO)
                        -against-                        :
                                                        :          MEMORANDUM AND
ARTHUR WESLEY KENZIE,                                    :              ORDER
                                    Defendant.           :
                                                        :
------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

        Plaintiff Gioconda Law Group PLLC alleges cybersquatting, trademark infringement,

unlawful interception and disclosure of electronic communications, and related state law claims

against Defendant Arthur Wesley Kenzie.  Plaintiff has filed a partial motion for judgment on the

pleadings with respect to Defendant's alleged violation of the Anticybersquatting Consumer

Protection Act (ACPA).  For the reasons that follow, Plaintiff's motion is denied.

I.      Standard of Review

        Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but

early enough not to delay trial—a party may move for judgment on the pleadings."  Under Rule

12(c), "a party is entitled to judgment on the pleadings only if it has established that no material

issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law."

*Bailey v. Pataki*, No. 08 Civ. 8563, 2010 WL 234995, at *1 (S.D.N.Y. Jan. 19, 2010) (quotation

marks and citations omitted).  "The standard for granting a Rule 12(c) motion for judgment on

the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim."  *Patel v.*

*Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citations omitted).

"In both postures, the district court must accept all allegations in the [non-movant's pleadings] as

true and draw all inferences in the non-moving party's favor." *Id.* (citation omitted).  As a

leading treatise explains:

> [A] Rule 12(c) motion is designed to provide a means of disposing
> of cases when the material facts are not in dispute between the
> parties and a judgment on the merits can be achieved by focusing
> on the content of the competing pleadings, exhibits thereto, matters
> incorporated by reference in the pleadings, whatever is central or
> integral to the claim for relief or defense, and any facts of which
> the district court will take judicial notice.  The motion for a
> judgment on the pleadings only has utility when all material
> allegations of fact are admitted or not controverted in the pleadings
> and only questions of law remain to be decided by the district
> court.

5C Charles Alan Wright & Arthur R. Miller, et al., Federal Practice and Procedure, § 1367 (3d

ed. 1998) (footnotes omitted); *accord Juster Associates v. City of Rutland, Vt.*, 901 F.2d 266, 269

(2d Cir. 1990).  Thus, "[i]n considering motions under Federal Rule 12(c), district courts

frequently indicate that a party moving for a judgment on the pleadings impliedly admits the

truth of its adversary's allegations and the falsity of its own assertions that have been denied by

that adversary."  Fed. Prac. & Proc. § 1370.  Because "hasty or imprudent use of this summary

procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair

hearing on the merits of his or her claim or defense," federal courts are "unwilling to grant a

motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact

remains to be resolved and that he is entitled to judgment as a matter of law."  Fed. Prac. & Proc.

§ 1368.  In considering Rule 12(c) motions, district courts may take notice of "the facts alleged

in the complaint, documents attached to the complaint as exhibits, and documents incorporated

by reference in the complaint."  *Piazza v. Florida Union Free Sch. Dist.*, 777 F. Supp. 2d 669,

677 (S.D.N.Y. 2011) (quotation marks and citations omitted).

II.     **Background**[1]

A.      **Facts Taken as True For Purposes of this Motion**

Plaintiff is a professional limited liability company duly organized under the laws of the State of New York.  It is engaged in the authorized practice of law with a particular focus on brand protection and intellectual property, and has focused significant energies in recent years on combating piracy and counterfeiting on the Internet.  Defendant is a sophisticated computer programmer with multiple advanced degrees in computer programming, including a Bachelor of Technology Degree in Computer Systems from BCiT with majors in Network Security Administration and Network Security Development.  His principal place of business is in Vancouver, British Columbia, Canada, and he identifies himself on LinkedIn as a "Cyber Security and Mobile App Developer."

Plaintiff's general allegation is that "[t]his case presents the Court with an identifiable Internet domain name cybersquatter and hacker who has intentionally intercepted e-mail traffic intended for the plaintiff, a New York law firm which focuses on anti-counterfeiting and brand protection litigation."  Defendant denies this particular allegation.  Plaintiff alleges that "[d]omain name typosquatting is a well-known form of cybersquatting that is usually used to capture web traffic when an Internet user accidentally misspells a legitimate domain name in his web browser."  Defendant agrees that this description is "essentially correct," though he emphasizes that the purpose of typosquatting can be either malevolent or benevolent.

Defendant registered GIOCONDOLAW.COM ("the Infringing Domain Name" or "IDN") and explains that he did so "within the broader context of his responsible, good faith information security research into a significant e-mail vulnerability that is not currently well

---

[1] This background reflects application of the Rule 12(c) standard of review to the pleadings.

understood." Defendant registered the IDN from third-party Internet Registrar GoDaddy, Inc. on

January 19, 2012. When Plaintiff discovered Defendant's conduct, it sent e-mails to the

addresses info@giocondolaw.com and joseph.gioconda@giocondolaw.com; it used a registered

receipt e-mail system to conclude that both of these e-mail messages were received by active

mailboxes capable of receiving misdirected messages. When he registered the IDN, Defendant

used the Domains by Proxy domain privacy service, "but not for the alleged sole purpose of

concealing his identity." Defendant then intentionally redirected Internet web browser users to

Plaintiff's legitimate web site—the Gioconda Law Group PLLC Website—"but not for the

alleged sole purpose of avoiding detection." After Plaintiff contacted Defendant and informed

him of the Complaint, Defendant replied, in part, as follows:

> As for starting litigation against me, I am not clear what has caused
> you to assume that I would not be amenable to resolving your
> concerns and claims. My intentions with the domain name you are
> concerned about are transparent and above board, as they are part
> of my research into an email vulnerability that I have been
> studying since September 2011 and which I have been publicly
> discussing on my website . . . I am doing nothing to cause any
> injury to your firm or any trademark rights you have, and would be
> glad to discuss those issues with you . . . I have no objections to
> facilitating a transfer of the domain to you."[2]

Defendant has also registered the following eight domain names: rnastercard.com,

rndonalds.com, nevvscorp.com, rncafee.com, rnacvvorld.com, rnonster.com, pcvvorld.com, and

---

[2] This text is taken from Pl. Ex. 3, the authenticity of which is acknowledged in Defendant's
Answer at ¶ 12.

qvvest.com.[3]  He admits that he directed that each of these Internet domain names redirect to the legitimate third parties' websites, "but not for the alleged sole purpose of avoiding detection."

Defendant was recently the subject of a Uniform Domain Name Resolution Policy ("UDRP") proceeding in a Complaint brought by Complainant Lockheed Martin, for the Defendant's similar registration of the confusingly similar Internet domain names LockheedMarton.com and LockheedMartun.com.  The UDRP Panel concluded that "no one could provide unsolicited service or subject a third party to a research programme without its consent and by using typos variation of a protected trademark."[4]  The Panel added that "[i]t is obvious that the Respondent intentionally created the possibility to receive the so-called 'Black Hole' correspondence of the Complainant . . . the Respondent itself [] created the alleged vulnerability of the Complainant's trademark, and his purpose was to offer services to the Complainant, looking for financial gain."

On April 17, 2012, Plaintiff received from the U.S. Patent and Trademark Office a registration number, indicating federal registration of the Service Mark "Gioconda Law Group PLLC" in International Class 45 for "providing information in the field of intellectual property."

Plaintiff's First Claim for Relief invokes the ACPA and alleges that "[t]he Infringing Domain Name that the Defendant has registered is virtually identifiable to, and/or confusingly similar to the Gioconda Law Service Mark, which was distinctive at the time that the Defendant registered the Infringing Domain Name."  Defendant admits this allegation.  Plaintiff further

---

[3] Plaintiff alleges, though Defendant denies, that these domain names are meant to mimic, respectively, mastercard.com, mcdonalds.com, newscorp.com, mcafee.com, macworld.com, monster.com, and pcworld.com, qwest.com.

[4] This opinion is incorporated by reference in the Complaint and, in any event, would be a proper subject of judicial notice under Federal Rule of Evidence 201.

alleges that "[t]he Defendant registered and is using the Infringing Domain Name with bad-faith intent to profit from the Gioconda Law Service Mark," that "[t]he Defendant has no bona fide noncommercial or fair use of the Gioconda Law Service Mark," and that "on information and belief, the Defendant intends to divert consumers away from the Plaintiff for unlawful commercial gain, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the Infringing Domain Name, and related e-mail addresses."  Defendant expressly denies these allegations.  Plaintiff adds, and Defendant denies, that Defendant's "acts have caused and will continue to cause irreparable injury to the Plaintiff and to the public."

        In his Answer, Defendant asserts a number of "Defenses."  Many of these "Defenses" are not affirmative defenses in the technical sense of the term.  Rather, they are statements of fact that deny specific allegations set forth in the Complaint (all of which are denied by Defendant in the responsive section of his Answer).  Defendant also elaborates on the nature of his conduct. He states that his actions "have been only for good faith, non-commercial, legitimate purposes, solely for the Plaintiff's benefit," adding that "[t]here have been no actual damages suffered by the Plaintiff, nor any damages intended, and only good faith, non-commercial, legitimate purposes intended by the Defendant."  He explains that his good faith purposes "have been for information security research into an e-mail vulnerability the Defendant initially called the 'Black Hole' e-mail vulnerability . . . there appears to be very little awareness of this vulnerability, which is the primary reason the Defendant was motivated to undertake this research."  Because "this vulnerability can be almost trivially exploited to covertly and passively undertake reconnaissance on a vulnerable organization," it opens entities like Plaintiff to "social engineering attacks."  The benefit Defendant confers, in his view, is that he prevents a malevolent entity from exploiting this gap in e-mail security and informs companies about the

6

need for protection by posting about how to defend against the vulnerability on his blog.

Defendant states that if he does receive e-mails intended for an entity like Plaintiff, he "ensure[s]

that the contents of vulnerable e-mails [are] never read or disclosed to third parties."  He adds

that he has "arranged for vulnerable domain names to be transferred to subject organizations so

that they could take their own responsibility for protecting themselves."  Defendant states that he

concealed his activities so that other members of the public would not learn which companies are

vulnerable and then target those entities.[5]

## III.    Discussion

### A.      Legal Standard

"To successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its

marks were distinctive at the time the domain name was registered; (2) the infringing domain

names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the

infringer has a bad faith intent to profit from that mark."  *Webadviso v. Bank of Am. Corp.*, 448

F. App'x 95, 97 (2d Cir. 2011) (citing 15 U.S.C. § 1125(d)(1)(a)).  Because Defendant expressly

admits Plaintiff's allegation that the IDN registered by Defendant "is virtually identical to, and/or

confusingly similar to the Gioconda Law Service Mark, which was distinctive at the time that the

Defendant registered the Infringing Domain Name," the only issue is whether Defendant acted

---

[5] In the "Defenses" section of his Answer, Defendant critiques the UDRP, invokes Professor
Orin Kerr's scholarship on the Wiretap Act to illuminate the nature of his security research
agenda, raises a number of defenses and arguments applicable to Plaintiff's unlawful interception
and disclosure of electronic communications claim, and critiques American privacy law.  He also
raises a Rule 11 "defense" and a "defense" based on the New York Rules of Professional
Conduct, which the Court interprets as motions for sanctions and denies as meritless.

with "bad faith intent to profit from that mark."  15 U.S.C. § 1125(d)(1)(A)(i).[6]  At this stage in

the case, accepting as true only facts admitted by Defendant in the pleadings, a determination of

"bad faith intent to profit" raises important questions about the ACPA's scope.  An overview of

the statute's purpose and the doctrine designed to implement it reveals the potential difficulties

of applying traditional bad faith analysis to a case like this one.

### 1.    The ACPA

"Cybersquatting involves the registration as domain names of well-known trademarks by

non-trademark holders who then try to sell the names back to the trademark owners.  Since

domain name registrars do not check to see whether a domain name request is related to existing

trademarks, it has been simple and inexpensive for any person to register as domain names the

marks of established companies.  This prevents use of the domain name by the mark owners,

who not infrequently have been willing to pay 'ransom' in order to get 'their names' back."

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).  In other

words, "[c]ybersquatting is the Internet version of a land grab.  Cybersquatters register well-

---

[6] Because these allegations are admitted in the Answer, the Court does not conduct an independent examination of whether they would withstand more careful scrutiny.  It is settled, however, that registrations with the U.S. Patent Trademark Office can support a finding that a mark is distinctive and famous.  *See TCPIP Holding Co. v. Haar Communications Inc.*, No. 99 Civ. 1825, 2004 WL 1620950, at *5 (S.D.N.Y. July 19, 2004).  By the same token, registration of domain names that constitute slight variations of a registered mark, including domain names that differ by one or two characters, often satisfies the requirement of confusing similarity.  *See, e.g.*, *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 497-98 (2d Cir. 2000); *TCPIP Holding*, 2004 WL 1620950, at *5; *Spear, Leeds, & Kellogg v. Rosado*, 122 F. Supp. 2d 403, 406 (S.D.N.Y. 2000) *aff'd sub nom. Spear, Leeds & Kellogg v. Rosado*, 242 F.3d 368 (2d Cir. 2000).  Indeed, courts have expressly held that the ACPA covers typosquatting.  *See, e.g.*, *S. Co. v. Dauben Inc.*, 324 F. App'x 309, 312 n.2 (5th Cir. 2009); *Green v. Fornario*, 486 F.3d 100, 103 n.5 (3d Cir. 2007); *Shields v. Zuccarini*, 254 F.3d 476, 483 (3d Cir. 2001) ("Zuccarini argues that registering domain names that are intentional misspellings of distinctive or famous names (or 'typosquatting,' his term for this kind of conduct) is not actionable under the ACPA . . . . This argument ignores the plain language of the statute and its stated purpose. . . .");  *Verizon California Inc. v. Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1094 (C.D. Cal. 2008).

known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name." *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002). This practice "is considered wrong because a person can reap windfall profits by laying claim to a domain name that he has no legitimate interest in or relationship to." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 238 (4th Cir. 2002).

Alarmed by a rising wave of cybersquatting in the 1990s, and concerned by the apparent inadequacy of preexisting laws, Congress enacted the ACPA in 1999. This law was passed "to protect consumers and holders of distinctive trademarks from 'cybersquatting.'" *Webadviso*, 448 F. App'x at 97 (quoting *Sporty's Farm*, 202 F.3d at 493). As the Senate Judiciary Committee explained, the ACPA was designed to "protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks . . . ." S. Rep. No. 106-140, at 4 (1999); *see also id.* at 9 (noting that the law aims squarely at "intent to trade on the goodwill of another's mark").

### 2.    The ACPA's Requirement of "Bad Faith Intent to Profit"

A key element of any ACPA violation is "bad faith intent to profit." *See Interstellar Starship Services*, 304 F.3d at 946 ("A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."). The Second Circuit has "expressly note[d] that 'bad faith intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts." *Sporty's Farm*, 202 F.3d at 499 n.13. To that end, the ACPA enumerates nine factors relevant to the bad faith inquiry:

9

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).  A leading treatise on the law of trademarks notes that "[t]he first

four factors suggest circumstances tending to indicate an absence of bad faith intent to profit

from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and

the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark."  4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.).

### 3.     The Scope of "Bad Faith Intent to Profit"

Because the ACPA has the potential to encompass a broad array of online conduct, courts are "reluctant to interpret the ACPA's liability provisions in an overly aggressive manner." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001); *see also id.* ("The ACPA was not enacted to put an end to the sale of all domain names.").[7]  This is particularly true of the bad faith intent to profit requirement.

Courts have struggled to define the boundaries of "bad faith intent to profit" because the ACPA expressly allows consideration of factors *beyond* the nine enumerated indicia.  *See* 15 U.S.C. § 1125(d)(1)(B)(i) (noting that courts "may consider factors such as, but not limited to" the nine enumerated indicia).  Courts have taken that grant of discretion to heart.  *See Sporty's Farm*, 202 F.3d at 498 ("[W]e are not limited to considering just the listed factors when making our determination of whether the statutory criterion has been met.  The factors are, instead, expressly described as indicia that 'may' be considered along with other facts.").  As the Fourth Circuit has explained, "[w]e need not . . . march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive."  *Virtual Works*, 238 F.3d at 269.

---

[7] This point also extends to some of the indicia of bad faith, which are just that: *indicia*.  *See, e.g.*, 4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.) ("[C]aution must be exercised, for the mere registration of multiple domain names for resale does not per se mark one as a cybersquatter.  One may be in a justifiable business of reserving many domain names.  For example, in one case defendant legitimately registered thousands of domain names for resale as 'vanity' e-mail addresses which consisted of common surnames, names of hobbies, careers, pets, sports interests, and music.  The fact that some of these resembled prominent trademarks did not make defendant a cybersquatter." (footnote omitted)).

Thus, a number of courts—including the Second Circuit—have departed from strict adherence to the statutory indicia and relied expressly on a more case-specific approach to bad faith. *See Sporty's Farm*, 202 F.3d at 499 ("The most important grounds for our holding that Sporty's Farm acted with a bad faith intent . . . are the *unique circumstances of this case*, which do not fit neatly into the specific factors enumerated by Congress but may nevertheless be considered under the statute." (emphasis added)); *see also Interstellar Starship Services*, 304 F.3d at 946-47. As part of that analysis, courts look to a defendant's whole course of conduct, including conduct during ACPA litigation. *See, e.g.*, *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration.").

This "unique circumstances" approach to the bad faith inquiry is logical and in accord with the plain language of the ACPA. *See Sporty's Farm*, 202 F.3d at 499. It allows courts to secure the ACPA's core purpose even where a defendant has sidestepped the nine indicia. *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 436 (4th Cir. 2011) *cert. denied*, 132 S. Ct. 575 (2011) (refusing to apply a "formalistic approach" to application of the enumerated factors and noting that doing so could "undermine the purpose of the ACPA, which seeks to prevent the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks" (quotation marks and citations omitted)). But this "unique circumstances" analysis must be undertaken with caution. As the House Report explained with respect to the nine indicia, "[t]hese factors are designed to balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of others' marks, including for purposes

12

such as comparative advertising, comment, criticism, parody, news reporting, fair use, etc."
Quoted in 2 Federal Unfair Competition: Lanham Act 43(a) Appendix H.  Given that the ACPA
reflects a careful assessment of the dangers presented by unduly broad application of the
ACPA's liability provisions, courts are well served to tread carefully in identifying additional
"unique circumstances" that reveal bad faith intent to profit.[8]

That inquiry must be guided by an assessment of how close a defendant's conduct falls to
the ACPA's heartland.  The clearest case for a finding of bad faith intent to profit typically arises
when a defendant "register[s] a domain name of an established entity in bad faith" and then
"offer[s] to sell the domain name to the entity at an exorbitant price."  *Target Adver., Inc. v.
Miller*, No. 01 Civ. 7614, 2002 WL 999280, at *10 (S.D.N.Y. May 15, 2002); *see also TCPIP
Holding*, 2004 WL 1620950, at *5 (finding bad faith intent to profit where a defendant
"submitted no less than three offers to sell back various packages of domain names (the vast
majority of which [he] acquired after he received Plaintiff's cease and desist letter) for exorbitant
demands of approximately half a million dollars").  Thus, courts have identified two
"quintessential example[s]" of bad faith: where a defendant "purchases a domain name very
similar to the trademark and then offers to sell the name to the trademark owner at an
extortionate price," and where a defendant "intend[s] to profit by diverting customers from the
website of the trademark owner to the defendant's own website, where those consumers would
purchase the defendant's products or services instead of the trademark owner's."  *Utah
Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1058 (10th Cir.

---

[8] The ACPA expressly creates another safe haven from unduly broad application of the bad faith
inquiry by providing that "[b]ad faith intent . . . shall not be found in any case in which the court
determines that the person believed and had reasonable grounds to believe that the use of the
domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).

2008); *see also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."). In those situations, the case for bad faith is at its peak.

In cases that vary too much from the specific evil contemplated by the ACPA, however, some courts have looked skeptically at claims of bad faith. On occasion, they have even refused to find an ACPA violation. As the Sixth Circuit noted in a 2004 decision:

> The paradigmatic harm that the ACPA was enacted to eradicate—the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark—is simply not present in any of [Defendant's] actions. In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an "intent to trade on the goodwill of another's mark." S.Rep. No. 106-140, at 9. *See also Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy when it passed the ACPA."). There is no evidence that this was [Defendant's] intention when she registered the Lucas Nursery domain name and created her web site. It would therefore stretch the ACPA beyond the letter of the law and Congress's intention to declare anything to the contrary.

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).

One year later, the Fifth Circuit adopted a similar approach while assessing an ACPA claim aimed at a site designed to "inform potential customers about a negative experience with [a] company." *TMI, Inc. v. Maxwell*, 368 F.3d 433, 439 (5th Cir. 2004). That court examined the nine statutory indicia of bad faith, then added that "we particularly note that Maxwell's conduct is not the kind of harm that ACPA was designed to prevent." *Id.* at 440; *see also id.* (noting the absence of bad faith after "analyzing the statutory factors and ACPA's purpose").

14

The Eleventh Circuit joined this line of precedent in 2009.  Emphasizing that "'bad faith'

is not enough" and that "[a] defendant is liable only where a plaintiff can establish that the

defendant had a 'bad faith *intent to profit*,'" the Eleventh Circuit saw no bad faith intent to profit

under the ACPA where a plaintiff accused the defendant "not of a design to sell a domain name

for profit but of a refusal to sell one."  *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235,

1246-47 (11th Cir. 2009) (citations omitted) (emphasis in original).  It added that:

> The Senate Report accompanying the Anticybersquatting
> Consumer Protection Act bolsters our understanding that a "bad
> faith intent to profit" is the essence of the wrong that the Act seeks
> to combat.  That report defines cybersquatters as those who:
>
> > (1) register well-known brand names as Internet
> > domain names in order *to extract payment* from the
> > rightful owners of the marks; (2) register well-
> > known marks as domain names and warehouse
> > those marks *with the hope of selling them* to the
> > highest bidder; (3) register well-known marks *to
> > prey on* consumer confusion by misusing the
> > domain name to divert customers from the mark
> > owner's site to the cybersquatter's own site; (4)
> > target distinctive marks *to defraud consumers*,
> > including to engage in counterfeiting activities.
>
> The report says nothing about those who hold onto a domain name
> to prevent a competitor from using it.

*Id.* at 1246 (quotation marks and citations omitted) (emphasis in original).

Although cases arising from attempts to suppress consumer commentary sites have

afforded many of the occasions for courts to warn against over-broad application of the ACPA's

bad faith inquiry, *see Lamparello v. Falwell*, 420 F.3d 309, 320 (4th Cir. 2005); *Mayflower

Transit, L.L.C. v. Prince*, 314 F. Supp. 2d 362, 370-71 (D.N.J. 2004), the core insight of these

rulings remains generally applicable in other ACPA contexts, *see Lewittes v. Cohen*, No. 03 Civ.

189, 2004 WL 1171261, at *8 (S.D.N.Y. May 26, 2004) ("[O]n the whole, the allegations set

forth in the Complaint do not even remotely suggest that defendants perpetrated the core activities that threaten to result in the paradigmatic harm that the ACPA was enacted to eradicate." (quotation marks and citations omitted)).

Of course, this logic does not entail the conclusion that an extortionate demand, or use of the improperly registered domain name in commerce, is always necessary to a violation of the ACPA, which sets out a more expansive list of indicia that may support a finding of bad faith intent to profit. *See, e.g.*, *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005) ("[O]ne of the nine factors listed in the statute that courts must consider is the registrant's 'bona fide noncommercial or fair use of the mark in a site accessible under the domain name.' This factor would be meaningless if the statute exempted all noncommercial uses of a trademark within a domain name. We try to avoid, where possible, an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress." (quotation marks and citations omitted)); *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 221 (E.D.N.Y. 2009) ("[A] review of the case law from other jurisdictions indicates that the prevailing view is that the ACPA does not require a plaintiff to demonstrate defendant's use in commerce."). Rather, these cases caution that where extortionate demands and use in commerce are absent, and the other indicia do not point toward bad faith, courts must step carefully in relying on a more general bad faith inquiry to conclude that a defendant violated the ACPA.

## B. Application

The only issue at this stage in the litigation is whether, on the pleadings and materials of which the Court may take notice, Plaintiff can prove enough facts to show that Defendant acted with "bad faith intent to profit" as that term is defined by the ACPA. Where Defendant has not admitted a fact and Plaintiff has not proven it through other means, the Court reads the absence

16

of that information in the light most favorable to Defendant.  In other words, for purposes of this motion for judgment on the pleadings, the Court will not assume that facts favor Plaintiff where there is simply no undisputed evidence about those facts based on the pleadings.

This analysis begins with the nine indicia of "bad faith intent to profit" enumerated in the statute.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).  There is no evidence either way concerning Defendant's rights in the domain name (Factor I), whether the domain name consists of a name that is commonly used to identify Defendant (Factor II), Defendant's prior use of the domain name in connection with the bona fide offering of any goods or services (Factor III), Defendant's bona fide noncommercial or fair use of the mark in a site accessible under the domain name (Factor IV), and Defendant's provision of true contact information (Factor VII).  The absence of any admitted facts in the pleadings regarding five of the nine indicia strongly augurs at this preliminary stage against a finding of bad faith intent to profit.

Factor V fits the facts awkwardly.  On the one hand, Defendant *did* intend to demonstrate his ability to lure consumers away from Plaintiff's site and e-mail system, thereby exposing a potential vulnerability in Plaintiff's online presence.  On the other hand, there is no evidence that Plaintiff did so in a manner that could harm the goodwill represented by Plaintiff's mark or otherwise damage the mark.  To the contrary, anybody who visited the site maintained by Defendant would be immediately redirected to Plaintiff's site.  It is possible that the diversion of e-mails from Plaintiff to Defendant has caused problems of a sort that would trigger the application of Factor V, particularly if Defendant replied to those e-mails in a manner that could have damaged Plaintiff's mark, but at this stage in the case there are not enough facts for the Court to conclude that Factor V indicates bad faith intent to profit.

17

Factor VI cuts against a finding of bad faith intent to profit, at least for purposes of this Rule 12(c) motion.  Although it appears that Defendant has not, and does not intend to, use the IDN in the bona fide offering of any goods or services, there is no evidence in the pleadings that Defendant has offered to sell the disputed IDN to a third party.  Nor is there evidence that he has attempted to sell it to Plaintiff, the mark owner.  Rather, in his e-mail to Plaintiff, Defendant said that "I am doing nothing to cause any injury to your firm or any trademark rights you have, and would be glad to discuss those issues with you . . . I have no objections to facilitating a transfer of the domain to you."  The Court's analysis of this factor might look different on a summary judgment record, depending on the evidence presented, but at this stage in the litigation it cuts in Defendant's favor.[9]

Factors VIII and IX support a finding of bad faith.  Defendant admits that he has acquired at least eight other domain names with an intent similar to that which motivated his acquisition of the IDN.  He also admits that Plaintiff's mark is famous and distinctive.

Reviewing the factors set forth in the ACPA, the Court concludes that only two of the nine weigh in favor of a finding of bad faith intent to profit.  That is not enough.  Accordingly, Plaintiff can prevail on this motion for judgment on the pleadings only if a more general assessment of the "unique circumstances" of this case demands a finding of bad faith.  *See Sporty's Farm*, 202 F.3d at 499.  That inquiry is guided by the analysis set forth above, which concluded that courts stand on firmer ground when they use "unique circumstances" analysis to enforce the core purpose of the ACPA, and that courts are more skeptical of such reasoning

---

[9] For example, Defendant denies in his Answer that a proposed transfer of the IDN to Plaintiff contemplates any payment by Plaintiff, a fact taken as true for purposes of this motion.

18

when a defendant's conduct falls outside the heartland of conduct contemplated by Congress in promulgating the ACPA.

Defendant alleges that his conduct is part of a security-focused research agenda into a vulnerability in e-mail systems of the sort used by Plaintiff.  He states that he undertook this activity for good faith, noncommercial reasons, and that he has arranged for domain names and e-mails to be transferred back to other entities situated similarly to Plaintiff.[10]  As an information security researcher, he believes that he is conferring numerous benefits on Plaintiff and on the public by drawing attention to a significant vulnerability.  He notes that there is no evidence that he has gained economic profit from his actions, made any other commercial use of the IDN, or attempted to sell the IDN back to Plaintiff.  Although a UDRP panel has condemned his behavior, it does not follow that Defendant's conduct therefore runs afoul of the ACPA.

The ACPA is designed principally for cases where a defendant either forces a mark-holder to purchase a domain name at an extortionate price or diverts customers from the mark-holder's website to the defendant's own website.  *See Utah Lighthouse*, 527 F.3d at 1058.  On the factual record that the Court must adopt for purposes of a Rule 12(c) motion, this case is not within those "core" ACPA scenarios.  Defendant's alleged ideological, scholarly, and personal motives for squatting on the IDN, while perhaps idiosyncratic, do not fall within the sphere of conduct targeted by the ACPA's bad faith requirement.  If anything, given that Defendant aims both to influence Plaintiff's behavior and shape public understanding of what he perceives to be an important vulnerability in cyber security systems, this case arguably falls closer to cases

---

[10] Defendant does not explain why he has not yet transferred the IDN to Plaintiff.  That bare omission, however, does not suffice to justify a finding of commercial intent or extortionate demands.

involving parody and consumer complaint sites designed to draw public attention to various social, political, or economic issues.  *Cf. Lamparello*, 420 F.3d at 320; *TMI*, 368 F.3d at 439.

The ACPA is not an all-purpose tool designed to allow the holders of distinctive marks the opportunity to acquire any domain name confusingly similar to their marks.  *See Schmidheiny v. Weber*, 319 F.3d 581, 582 (3d Cir. 2003) ("The purpose of the [ACPA] is to curtail *one form of cybersquatting*—the act of registering someone else's name as a domain name for the purpose of demanding remuneration from the person in exchange for the domain name." (quotation marks and citations omitted) (emphasis added)).  The requirement of bad faith intent to profit imposes an important limit that cabins the statute's scope and ensures that the ACPA targets only the specific evils that Congress sought to prevent.  This third element thus leaves untouched conduct that might annoy or frustrate mark holders, but that Congress shielded from liability by enumerating indicia of the sort of bad faith it had in mind.  *See, e.g.*, *S. Grouts & Mortars*, 575 F.3d at 1246-47; *TMI*, 368 F.3d at 439; *Lewittes*, 2004 WL 1171261, at *8. Thus, on the facts taken as true for purposes of this motion, the Court cannot find that Defendant acted with the "bad faith intent to profit" prerequisite to an ACPA violation.

**IV.    Conclusion**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is DENIED.

The Clerk of Court is directed to close the motion at Dkt. No. 26.

SO ORDERED.

Dated: New York, New York
       April 23, 2012

_____
J. PAUL OETKEN
United States District Judge

20